*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
March 18, 2021

Plaintiff-Appellee,

V

No. 350590
Montcalm Circuit Court
LC No. 2019-25102-FH

TERRY C. HALLER,

Defendant-Appellant.

Before: SWARTZLE, P.J., and MARKEY and TUKEL, JJ.

PER CURIAM.

Defendant appeals by right his jury trial conviction of resisting and obstructing a police officer, MCL 750.81d(1). A charge of domestic violence, MCL 750.81(2), was dismissed when the complainant failed to appear at the trial. The trial court sentenced defendant to nine months in jail and three years' probation. We affirm.

## I. FACTS

On the night of February 7, 2019, Michigan State Police Trooper Megan Moryc responded to a private residence where defendant, his life partner Shawn Maxon, and their children resided. Trooper Moryc testified, "I was dispatched out to a domestic violence situation [regarding] assault involving a knife." The trooper elaborated that dispatch informed her that it was defendant who was wielding the knife. She drove to the house with her emergency lights and siren activated but turned them off just before she pulled into the driveway of the residence. Trooper Moryc was not accompanied by a partner or other officer. Trooper Moryc testified that a fellow officer radioed her as she drove to the home and informed her that defendant kept a .22 caliber long rifle and a shotgun in the garage.

Dashcam video footage from the trooper's cruiser was admitted into evidence. And the video, along with the trooper's testimony, revealed that the cruiser faced the front of the home's detached, two-bay garage upon entering the driveway. Trooper Moryc parked in the driveway,

-1-

leaving a distance of approximately 40 feet between her cruiser and the front of the garage.[1] The trooper testified that Maxon, who looked scared, leaned out of a door to the home and indicated that defendant was in the garage.[2] The garage had one large door for the left bay, as viewed from the perspective of the driveway, along with, it appears, a couple of slightly smaller doors for the right bay area. These garage doors were closed when Trooper Moryc first arrived at the residence. The cruiser's spotlight and headlights were aimed at the front of the garage, and, using the cruiser's microphoned loudspeaker, the trooper, who had called for backup, told defendant to come out of the garage with his hands up. Defendant did not respond, so Trooper Moryc put her vehicle into reverse and backed up a short distance while still remaining in the driveway. She testified that she then planned to wait for backup to arrive, but suddenly the large garage door to the left bay opened up, and defendant was standing there. Based on the video footage, which had a time marker, approximately thirty-eight seconds elapsed between Trooper Moryc's command directing defendant to come out of the garage and the point when defendant opened the garage door and actually appeared.

Trooper Moryc observed that defendant held a dangling silvery object in one hand. Using the cruiser's microphone, the trooper ordered defendant to drop the object, and he immediately placed the object on the ground. Trooper Moryc exited her cruiser, stood behind the A-pillar of the partly-open driver's side door, drew her gun, and commanded defendant to turn around and walk backward towards her with his hands up.[3] Defendant responded he would not leave the garage because it was too cold. More specifically, according to the trooper, defendant stated, " 'No. It's cold outside.' " Trooper Moryc again commanded defendant to turn around and walk backward toward her position, and he again expressed that he would not do so because it was cold outside.[4] The trooper yelled that she did not care and ordered him to comply. Both of the commands for defendant to turn around and walk backward were communicated to him through use of the cruiser's microphone and loudspeaker system.

After his refusals to comply, defendant suddenly started moving face forward toward Trooper Moryc. His arms were swinging freely by his side. Defendant moved at a brisk pace, not quite running but also not just walking at normal speed. The trooper testified that it appeared that defendant's fists were partially clenched and that he kept moving toward her despite her commands

---

[1] We are estimating the distance on the basis of the video. There was no testimony directly stating the distance in units of measurement although Trooper Moryc did indicate that the distance was roughly the length of the courtroom.

[2] The audio from the dashcam video reflected that Trooper Moryc asked Maxon where defendant was located and that Maxon stated that defendant was in the garage.

[3] The trooper explained that, for her protection, she did not want defendant facing her when he moved, otherwise he would have a direct line of sight and could pose a danger to her safety.

[4] The trooper testified that defendant twice explicitly stated that he would not move or leave the garage because of the cold. The dashcam video corroborates Trooper Moryc's assertions regarding her commands to defendant and that defendant responded; however, we cannot discern from the audio what exactly defendant stated, but he did not move.

for defendant to stop.  In our review of the video, however, it took a moment for Trooper Moryc, who was speaking on her radio at the time, to direct defendant to stop moving. Defendant immediately stopped when she first yelled at him, telling defendant to turn around and kneel on the ground.  From this stage forward, Trooper Moryc was yelling her commands and no longer using the microphone.

Trooper Moryc testified, and the video footage depicted, that defendant stopped when he was about 10 to 15 feet away from her cruiser.  As noted, the trooper commanded defendant to turn around and get down and kneel on the ground.  The trooper testified that she also told defendant at that point to place his hands behind his head, but the audio from the video footage did not disclose such a command.  Trooper Moryc testified that defendant did not put his hands behind his head; he kept moving them, but he did turn around and kneel on the ground.  The trooper then told defendant to put his hands up.  Defendant, however, stood up, even though he was not instructed to do so.[5]  The trooper proceeded to yell at defendant to get back on the ground and place his hands behind his head; defendant complied.  Police backup then arrived, and defendant was handcuffed and taken into custody.

Defendant was given his Miranda rights and interviewed at the scene.  Trooper Moryc testified that defendant was angry and that she detected the odor of intoxicants on his person. Defendant acknowledged that he had been drinking.  The trooper indicated that while the object that defendant held in his hand and dropped was never specifically identified, it was not a gun or a knife.  Defendant told her that it was a "tool."  Defendant was found with a folding pocket knife in a pants' pocket.

Trooper Moryc testified that it was extremely windy, very cold, snowy, and icy that night. She described the driveway, which was fairly flat, as very icy.  Trooper Moryc also stated that as the events of that evening transpired, she could hear defendant when he spoke despite the strong winds, including when he indicated that he would not comply with her order to exit the garage. The trooper further testified that her commands were communicated in a clear manner.

Maxon, the only witness to testify at trial aside from Trooper Moryc, indicated that she and defendant had four children together, two of whom, a son and a daughter, were at the home on the night of the incident.  Maxon was called as a witness by the prosecution, and the prosecutor was permitted to ask leading questions after the court found that Maxon was a hostile witness.  Her testimony was combative.  Maxon did testify that she and defendant argued on the evening of February 7, 2019, as did defendant and their son.  The domestic violence charge was based on an alleged altercation between the son and defendant. Maxon testified that while defendant was tense that evening, he was not aggressive, was not acting in a "different" manner, and did not physically

---

[5] On appeal, defendant claims that he thought that Trooper Moryc told him to stand up, not to put his hands up.  The video footage could be interpreted as supporting that possibility, but defendant never testified, nor did the video record him saying that he misunderstood.  Consequently, there is no evidence in the record regarding what defendant thought or believed that he heard.  Trooper Moryc testified on cross-examination that it is possible that defendant may have thought that she said "stand up," as opposed to "put your hands up."  Again, the trooper was now yelling her commands and not using her microphone.

assault anyone. She admitted that she had been drinking at the time and was struggling to deal with their autistic daughter. Maxon explained that there had been a power outage caused by the weather conditions and that defendant went outside to work on their generator not long before Trooper Moryc arrived. According to Maxon, defendant also agreed to go outside to avoid further argument with their son. Maxon claimed that she did not recall telling Trooper Moryc that Maxon made defendant leave the house because he was being aggressive. Maxon did not remember making several statements that the trooper had attributed to Maxon.

Because the son did not appear at trial, the prosecutor decided to dismiss the charge of domestic violence. We will discuss below the conversations by the parties and the trial court regarding the admission of evidence concerning the domestic violence and defendant's demeanor and conduct before the trooper arrived. At the conclusion of the prosecution's proofs, defense counsel informed the trial court that defendant was choosing not to testify. Counsel indicated that she had discussed with defendant his absolute constitutional right not to testify as well as his right to testify if he so chose. Defendant himself confirmed to the court that he had decided not to testify upon consultation with his attorney. With respect to the charge of resisting and obstructing an officer (R&O), the trial court instructed the jury on the elements of the offense as follows:

> First, that the Defendant assaulted, battered, wounded, resisted, obstructed, opposed, or endangered Trooper Moryc, who was also a police officer. Obstruct includes the use or threatened use of physical interference or force or a knowing failure to comply with a lawful command. The Defendant must have actually resisted by what he said or did, but physical violence is not necessary. Second, that the Defendant knew or had reason to know that Trooper Moryc was a police officer performing her duties at the time. Third, that Trooper Moryc gave the Defendant a lawful command, was making a lawful arrest, or was otherwise performing a lawful act.

This instruction was consistent with M Crim JI 13.1. The jury found defendant guilty of R&O, and he was sentenced to nine months in jail and three years' probation. Defendant now appeals by right. After filing the claim of appeal, defendant moved for remand in this Court, seeking an evidentiary hearing and arguing that "remand is necessary to develop the factual record necessary for appellate review of whether defense counsel deprived [defendant] of his constitutional right to the effective assistance of counsel by coercing him to waive his right to testify." This Court denied the motion "without prejudice to a case call panel . . . determining that remand is necessary once the case is submitted on a session calendar." *People v Haller*, unpublished order of the Court of Appeals, entered April 20, 2020 (Docket No. 350590).

## II. ANALYSIS

### A. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that the evidence was insufficient to support the conviction for R&O. Defendant, citing MCL 750.81d(7)(a), contends that obstruction entails the use or threatened use of physical interference or force or a knowing failure to comply with an officer's lawful command. Defendant maintains that the evidence was insufficient to establish obstruction because the dashcam video from the police cruiser showed that defendant complied with each and

every reasonable command immediately or within moments. With respect to defendant's walking face forward instead of backward down the driveway, defendant asserts that he "walked forward only after seeking clarification or explaining his concern about walking backwards down an icy driveway." Defendant states that while the command to walk backward down the driveway was lawful, it was not a reasonable command because it placed defendant in jeopardy or risk of severe injury. With regard to standing up from the kneeling position that he had assumed after first moving forward, defendant claims that he simply misunderstood the trooper's command, thinking that she directed him to stand up, not put his hands up. Every other command given by the trooper was, according to defendant, complied with in full. Defendant also complains that the trooper overreacted to a situation that she herself created by not waiting for backup and that she did not attempt to discern a reasonable way to address the situation.

## 1. STANDARD OF REVIEW

We review de novo the issue regarding whether there was sufficient evidence to support a conviction. *People v Mikulen*, 324 Mich App 14, 20; 919 NW2d 454 (2018).

## 2. GOVERNING PRINCIPLES

In *Mikulen*, *id.*, this Court recited the well-established principles that govern a claim that there was insufficient evidence to sustain a verdict:

> In reviewing the sufficiency of the evidence, this Court must view the evidence—whether direct or circumstantial—in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt. A jury, and not an appellate court, observes the witnesses and listens to their testimony; therefore, an appellate court must not interfere with the jury's role in assessing the weight of the evidence and the credibility of the witnesses. Circumstantial evidence and the reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of a crime. The prosecution need not negate every reasonable theory of innocence; instead, it need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant. We resolve all conflicts in the evidence in favor of the prosecution. [Citations omitted.]

## 3. DISCUSSION

MCL 750.81d(1) provides that "an individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers a person who the individual knows or has reason to know is performing his or her duties is guilty of a felony punishable by imprisonment for not more than 2 years or a fine of not more than $2,000.00, or both." MCL 750.81d(7)(a) defines the term "obstruct" as including "the use or threatened use of physical interference or force or a knowing failure to comply with a lawful command." To "resist" means to strive against, oppose, or to withstand, and "resistance" entails opposition offered by some mechanism. *People v Morris*, 314 Mich App 399, 408-409; 886 NW2d 910 (2016). The *Morris* panel also observed:

[T]o convict defendant [under MCL 750.81d(1),] it was not necessary for the jury to find that defendant actually ran away from the officers or physically assaulted them. All that was necessary was to find that he was taking the requisite physical action to prevent a police officer from performing his lawful duties. Additionally, the duration of the resistance or the mental state of defendant at the time is of no import, as resistance can occur in even the briefest of moments, and the statute does not require that defendant be found to be free of any mitigating motivation. [*Morris*, 314 Mich App at 414-415.]

A defendant must actually resist by what he or she said or did, but physical violence is not required. M Crim JI 13.1; *People v Quinn*, 305 Mich App 484, 494; 853 NW2d 383 (2014).

We first note that defendant's argument focuses on "obstruction" absent any real discussion of "resistance" or "opposition," even though the jury may very well have convicted defendant for resisting or opposing Trooper Moryc. See MCL 750.81d(1); M Crim JI 13.1. Using the cruiser's loudspeaker, Trooper Moryc ordered defendant to come out of the garage with his hands up, yet defendant failed to appear for 38 seconds. This delay in responding could reasonably be construed as resisting or opposing a police officer's lawful command or, as to obstruction, a knowing failure to comply with a lawful command. Contrary to defendant's suggestion, he did not comply within "moments."

Additionally, when defendant finally opened the garage door, he was twice commanded to turn around and walk backward toward Trooper Moryc. But he expressly refused to comply with both directives because it was cold outside. This, however, was no excuse for failing to comply with the trooper's lawful commands, and defendant does not provide any authority to the contrary. Expressly telling the officer that he would not exit the garage and his accompanying failure to move in the manner directed constituted evidence showing that defendant resisted and opposed the trooper and that he failed to comply with lawful commands. Defendant now argues, referring to an averment in his affidavit attached to his motion for remand, that the commands were unreasonable because walking backward on the icy driveway posed a danger of slipping and falling.[6] We initially note that the focus is on the *lawfulness* of the command and not on its reasonableness.[7] See MCL 750.81d(7)(a). Also, the self-serving affidavit is not part of the lower court record. See *People v Horn*, 279 Mich App 31, 38; 755 NW2d 212 (2008) ("we decline to consider the affidavits submitted with defendant's motion for remand"). Furthermore, the evidence established that defendant's expressed yet dubious reason for not complying with the trooper's two commands was that it was cold outside. Defendant said nothing about the icy driveway. Defendant is effectively attempting to testify through his affidavit without being judged by a jury and without being subjected to cross-examination by a prosecutor. This we will not

---

[6] Defendant asserted in his affidavit that "[t]he drive was covered with ice and slanted down toward the officer who was giving me commands to walk backwards and I was concerned that I would fall if I did[.]"

[7] We recognize that a command can be dangerously unreasonable, but in that case the command would effectively be unlawful. An officer cannot demand that a suspect walk over a 100-foot cliff—that would be an unlawful command. Here, the command was not unlawful.

-6-

allow. Defendant's refusal to comply with Trooper Moryc's two lawful commands to walk backward toward her position with his hands up supported a finding that defendant resisted, opposed, and obstructed the trooper.

Additionally, defendant's actions in moving forward from the garage and heading toward Trooper Moryc face first at a brisk pace was in direct contravention of the trooper's command to walk backward; she never told defendant to proceed as he did. Defendant's conduct again demonstrated resistance, opposition, and obstruction, as well as showing that he was not afraid of falling on ice. Next, after defendant knelt on the ground and was told to put his hands up, he instead stood up. This action represented yet another example of defendant failing to comply with a lawful command. Defendant claims that he misunderstood Trooper Moryc, believing that she directed him to stand up, as opposed to ordering him to put his hands up. Other than the mere fact that defendant stood up as soon as the trooper told him to put his hands up, there is nothing in the record that supports defendant's contention. And it was for the jury to assess the weight of the evidence and resolve conflicts in the evidence. In his affidavit attached to the motion for remand, defendant averred that he "misunderstood the officer's command 'hands up' as 'stand up[.]' " Reliance on the affidavit is erroneous for the reasons already discussed above. Moreover, even if this conduct is not considered, there was still abundant evidence to support the R&O conviction.

Defendant also complains that the trooper overreacted to a situation that she herself created by not waiting for backup and that she did not attempt to find a reasonable way to address the situation. These arguments lack merit and are irrelevant with respect to whether defendant resisted, opposed, or obstructed Trooper Moryc. Neither of defendant's claims rendered the trooper's commands unlawful or provided a legal excuse for defendant's failure to comply with Trooper Moryc's commands.

In sum, viewing the evidence in a light most favorable to the prosecution, appreciating that issues concerning the weight of the evidence and the credibility of the witnesses were for the jury to assess and resolve, and resolving all conflicts in the evidence in favor of the prosecution, we hold that the evidence was sufficient to support the conviction for R&O.

## B. ALLEGED EVIDENTIARY ERROR

Defendant next argues that given that the charge of domestic violence was dismissed, the trial court abused its discretion when it allowed the prosecution to elicit testimony regarding defendant's demeanor and behavior before Trooper Moryc arrived at the home on the night at issue. Defendant contends that the examination and evidence were unduly prejudicial and that the error was not harmless. Defendant contends that the trial court limited the testimony regarding domestic violence to the information that the trooper received from dispatch, yet the prosecutor elicited testimony from Shawn Maxon that went far beyond the court's limitation, including testimony with regard to whether defendant was extremely aggressive. Relying on MRE 403, defendant argues that the probative value of Maxon's testimony was minimal at best and that the minimal probative value of the testimony was substantially outweighed by the danger of unfair prejudice.

## 1. STANDARD OF REVIEW

We review for an abuse of discretion a trial court's decision to admit evidence. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). "When the decision regarding the admission of evidence involves a preliminary question of law, such as whether a statute or rule of evidence precludes admissibility of the evidence, the issue is reviewed de novo." *People v Washington*, 468 Mich 667, 670-671; 664 NW2d 203 (2003). A trial court necessarily abuses its discretion when it makes an error of law. *People v Duncan*, 494 Mich 713, 723; 835 NW2d 399 (2013).

## 2. GOVERNING PRINCIPLES

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403. In *People v Crawford*, 325 Mich App 14, 29-30; 923 NW2d 296 (2018), vacated in part on other grounds by 503 Mich 990 (2019), this Court discussed the parameters of MRE 403, explaining:

> MRE 403 does not prohibit prejudicial evidence; only evidence that is unfairly so. And evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury. In other words, where a probability exists that evidence which is minimally damaging in logic will be weighed by the jurors substantially out of proportion to its logically damaging effect, a situation arises in which the danger of prejudice exists. All evidence offered by the parties is prejudicial to some extent, but the fear of prejudice does not generally render the evidence inadmissible. Unfairness might arise when the . . . evidence injects considerations extraneous to the merits of a case, e.g., a jury's bias, shock, sympathy, or anger. Unfairness might not exist where the critical evidence supporting a party's position on a key issue raises the danger of prejudice within the meaning of MRE 403 but the proponent of this evidence has no less prejudicial means by which the substance of this evidence can be admitted. The prosecution may offer all relevant evidence, subject to MRE 403, on every element of an offense, given that the elements of an offense are always at issue. [Quotation marks, citations, ellipses, and alteration brackets omitted.]

## 3. DISCUSSION

As noted earlier, the prosecutor did not pursue the charge of domestic violence because defendant's son—the alleged victim of the violence—did not appear at trial to testify. Maxon was also being defiant. Before Trooper Moryc's testimony, the parties and the trial court, outside the presence of the jury, discussed how to handle the facts associated with the charge of domestic violence now that the charge was being dismissed. The court decided that it would allow the prosecution to introduce testimony that Trooper Moryc was responding to a domestic violence call that involved an altercation and a knife. The court also added that the trooper could "testify to the information she received in the dispatch." The trial court made these rulings on the premise that the reasons why the trooper went to the home were relevant to her actions and conduct in confronting defendant, thereby giving context to the situation.

Defendant's argument is focused on Maxon's testimony that was elicited by the prosecutor, which defendant contends exceeded the limits placed by the trial court on the evidence concerning domestic violence. Defendant quotes at length Maxon's testimony, emphasizing the questions posed by the prosecutor on direct examination that defendant deems improper. These questions pertained to the timeframe just before Trooper Moryc's arrival. They concerned whether the home environment was good, whether there was some arguing going on, whether defendant was acting differently when he returned home from work, whether defendant was tense, whether defendant was aggressive, and whether defendant was extremely aggressive. Maxon agreed that there were arguments and that everyone was tense, but she denied that defendant was "different" that night, denied that he was extremely aggressive, and denied that he was aggressive to any degree. Maxon also did not recall or remember telling Trooper Moryc that defendant was acting differently, that he was aggressive, or that he was extremely aggressive.

Defendant apparently has no objection to the testimony that the trooper was responding to a call that concerned domestic violence involving defendant's wielding a knife. We thus fail to see how the questions and responses being challenged would have had any prejudicial effect that went beyond the impact of the jury's hearing that Trooper Moryc was responding to a domestic violence call entailing an assault by defendant using a knife. See MCL 769.26 (reversal is only warranted when an error results in a miscarriage of justice); *Lukity*, 460 Mich at 495 ("In other words, the effect of the error is evaluated by assessing it in the context of the untainted evidence to determine whether it is more probable than not that a different outcome would have resulted without the error."). Adding further support for this conclusion is the fact that the evidence presented at trial overwhelmingly established that defendant resisted, opposed, and obstructed Trooper Moryc. Moreover, Maxon did not even concede that defendant was being aggressive or overly aggressive or acting differently; she denied the assertions. Indeed, considering her testimony, it may have, if anything, tempered the evidence that the trooper was responding to a claim of domestic violence involving defendant's use of a knife.

Additionally, we cannot even conclude that the prosecutor's questions and the elicited testimony necessarily exceeded the boundaries set by the trial court, which would explain why defense counsel did not object during the prosecutor's examination of Maxon. Nevertheless, assuming that the probative value of the challenged testimony was substantially outweighed by the danger of unfair prejudice and that the court abused its discretion by allowing the testimony, we hold that the presumed error was harmless and did not prejudice defendant for the reasons discussed above.[8]

## C. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant claims that trial counsel provided ineffective assistance because she encouraged or coerced him not to testify at trial, which prejudiced defendant, as there is a reasonable probability that his testimony would have changed the outcome of the proceedings. In defendant's affidavit attached to his motion for remand, he averred that his attorney persuaded him "not to

---

[8] To the extent that the alleged error was not encompassed by defense counsel's objection below relative to domestic violence and thus unpreserved, the presumed error did not affect defendant's substantial rights. *Carines*, 460 Mich at 763-764.

testify with vague statements to the effect that the prosecution would 'tear me apart' and [that] the prosecutor had 'his ways of making me look bad.' " Defendant further asserted, "These vague statements frightened me and coerced me into not testifying, even though it was my desire to tesitfy." Defendant claims that had he taken the stand, he would have testified that he was concerned and worried about falling had he walked backward on the icy driveway, that his hands were not clenched when he approached Trooper Moryc, that he misunderstood the trooper's command to put his hands up, believing that she told him to stand up, and that he did everything he could do to comply with the trooper's commands throughout the encounter.

## 1. STANDARD OF REVIEW

Whether counsel was ineffective presents a mixed question of fact and constitutional law, and factual findings are reviewed for clear error, whereas questions of law are reviewed de novo. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

## 2. GOVERNING PRINCIPLES

In *People v Carbin,* 463 Mich 590, 599-600; 623 NW2d 884 (2001), the Michigan Supreme Court recited the principles that are applicable to a claim of ineffective assistance of counsel:

> To justify reversal under either the federal or state constitutions, a convicted defendant must satisfy [a] two-part test . . . . First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not performing as the counsel guaranteed by the Sixth Amendment. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. Second, the defendant must show that the deficient performance prejudiced the defense. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim. [Quotation marks and citations omitted.]

An attorney's performance is deficient if the representation falls below an objective standard of reasonableness. *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000).

## 3. DISCUSSION

"The decision to call or not call the defendant to testify is a matter of trial strategy." *People v Alderete*, 132 Mich App 351, 360; 347 NW2d 229 (1984). "A defendant's right to testify in his own defense arises from the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution[,] [and] [a]lthough counsel must advise a defendant of this right, the ultimate decision whether to testify at trial remains with the defendant." *People v Bonilla-Machado*, 489 Mich 412, 419; 803 NW2d 217 (2011). We acknowledge that a criminal defense attorney may be ineffective when he prevents his or her client from testifying against the client's wishes. See, e.g., *Nichols v Butler*, 953 F2d 1550, 1552-1553 (CA 11, 1992). A criminal defense attorney must "abide by the

client's decision, after consultation with the lawyer, with respect to . . . whether the client will testify." MRPC 1.2(a). A criminal defense attorney is presumed to follow the rules of professional conduct when advising his or her client concerning the decision whether to testify at trial. *United States v Webber*, 208 F3d 545, 551 (CA 6, 2000). This Court has held that "[i]f the accused expresses a wish to testify at trial, the trial court must grant the request, even over counsel's objection." *People v Simmons*, 140 Mich App 681, 685; 364 NW2d 783 (1985). But if a criminal defendant "acquiesces in his attorney's decision that he not testify, the right will be deemed waived." *Id*. (quotation marks and citation omitted).

As we discussed earlier, at the conclusion of the prosecution's proofs, defense counsel informed the trial court that defendant was choosing not to testify. Counsel indicated that she had discussed with defendant his absolute constitutional right not to testify as well as his right to testify if he so chose. Defendant himself confirmed to the court that he had decided not to testify upon consultation with his attorney. Defendant now claims that his trial attorney essentially scared him into exercising his constitutional right not to testify. Defendant waived his right to testify, and we are not prepared to allow him to overcome that waiver with his self-serving affidavit calling into question the voluntariness of his decision not to testify. Moreover, assuming that it is proper to consider defendant's affidavit and that the averments are true, we cannot conclude that defense counsel was ineffective for advising defendant that the prosecutor could potentially decimate him or eviscerate his testimony on cross-examination. This is especially true in this case considering the evidentiary ammunition at the prosecutor's disposal to employ on cross-examination, i.e., the dashcam video footage that plainly demonstrated that defendant committed the offense of R&O and that undermine defendant's averments regarding his proposed testimony. Defendant has not established deficient performance by counsel. Reversal is unwarranted.

## III.  CONCLUSION

The evidence presented at trial was sufficient to support the conviction of R&O. Further, the testimony by Maxon that defendant challenged was harmless and did not prejudice defendant, even assuming that it was inadmissible and should not have been elicited by the prosecutor. Finally, defendant's trial attorney was not ineffective with respect to defendant's decision not to testify after consultation with counsel.

We affirm.


/s/ Brock A. Swartzle
/s/ Jane E. Markey
/s/ Jonathan Tukel