*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

RASEAN KIWAN CURTIS, also known as RAY CURTIS,

        Defendant-Appellant.

UNPUBLISHED
June 24, 2021

No. 351296
Washtenaw Circuit Court
LC No. 19-000048-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DAVID WESLEY SKINNER,

        Defendant-Appellant.

No. 351771
Washtenaw Circuit Court
LC No. 17-000798-FC

Before: BOONSTRA, P.J., and MARKEY and SERVITTO, JJ.

PER CURIAM.

In a joint trial before a single jury, defendants Rasean Curtis and David Skinner were both convicted of first-degree felony murder, MCL 750.316(1)(b), and armed robbery, MCL 750.529. Curtis was also convicted of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, and second-degree murder, MCL 750.317, which conviction was vacated by the court. Both defendants were sentenced to life imprisonment without the possibility of parole for the felony-murder convictions and to 210 months to 40 years' imprisonment for the armed-robbery convictions. Curtis also received a two-year term of imprisonment for the felony-firearm conviction. Curtis appeals by right in Docket No. 351296, and Skinner appeals by right in Docket No. 351171. On appeal, Curtis contends that the trial court violated his right to self-representation and that defense counsel was ineffective for pursuing a defense-of-others theory

-1-

and failing to investigate a defense theory that Curtis was not at the scene of the murder. Skinner argues on appeal that the trial court committed instructional error, that the prosecution failed to submit sufficient evidence to sustain his convictions, and that defense counsel provided ineffective assistance. We affirm.

## I. BACKGROUND

In August 2017, Skinner arranged to purchase marijuana from the murder victim, Allen Shevrovich, through a middle man, Dallas Stone. On the night of the murder, Shevrovich, his fiancé, Kellsey Brehmer, and Stone rode together in Brehmer's vehicle to meet with Skinner. When they located Skinner, he was accompanied by Curtis. Defendants entered the vehicle, sitting in the backseat. Brehmer was behind the wheel in the driver's seat; Shevrovich sat in the front passenger seat; Stone sat in the backseat behind Shevrovich; Curtis sat behind Brehmer; and Skinner sat between Curtis and Stone.

While Brehmer drove, the others discussed the marijuana sale, and Shevrovich eventually gave Skinner a baggie of marijuana. Skinner questioned whether the amount or weight of the marijuana was correct, and there was a discussion about finding a scale to weigh the drugs. Skinner told the others that he had a friend who kept a scale at a house. Stone offered to hold the marijuana until they got to the house. Skinner, however, remarked, "This is mine, I'm takin' this." And he put the marijuana in a pocket of his hoodie. With respect to what transpired next, Stone testified:

> [Shevrovich] turned around with [a] knife already drawn out on the—center console, never passin' it, never, you know, nothin' like that, but he just stayed right there, turned around to show him the knife to present it, and he says, "So you're gonna' rob me," All right, no, he said, "You're gonna rob me," and—Okay, let me—let me take a break here. He turned around the center console, and he never crossed it, he never did any of that, he just stayed and he presented the knife. [Skinner] said, "What, are you gonna' stab me?" And [Shevrovich] said, "Are you gonna' take my shit?," talkin' about the weed.

According to Stone, Shevrovich never crossed the center-console threshold into the backseat area with the knife. Shevrovich was stilling facing forward, but his body was turned. Stone testified that Shevrovich did not wave the knife around; rather, he merely displayed it in his hand. On cross-examination, Stone acknowledged that the knife was three or four feet from Skinner's face. Stone next observed a gun in Curtis's right hand. Brehmer testified that she also saw the gun and that Curtis had pulled it out while Shevrovich and Skinner were confronting each other about the marijuana transaction. Curtis pointed the gun at Shevrovich through the center console area. Stone testified that when Shevrovich saw the firearm, he said, "I'm not afraid of that," as he turned to face forward. Curtis then shot Shevrovich in the head.

Brehmer testified that she heard the shot and saw Shevrovich slump over in his seat. She also heard a couple more shots. Stone testified that Curtis, after shooting Shevrovich, fired at Stone as he hid behind Skinner. Stone blurted out, "Don't do this, I know your name's David Skinner." Stone testified that he grabbed Skinner while dodging bullets. Brehmer then heard someone shout, "We gotta' go." Curtis and Skinner exited the car and started running. After a

failed attempt at chasing defendants, Brehmer returned to the car, held a shirt against Shevrovich's head wound, and called 911. Shevrovich later died.

At trial, Curtis claimed that he shot Shevrovich in defense of Skinner. Skinner asserted that he did not intend to steal the marijuana, that he did not know that Curtis even had a gun, and that the requisite malice was lacking. Defendants were convicted and sentenced as stated earlier. They now appeal by right.

## II. DOCKET NO. 351296

Curtis informed the trial court before trial commenced that he wished to fire his attorney. The court rejected his request. On appeal Curtis argues that the court assumed that Curtis wanted replacement counsel, but Curtis was actually willing to proceed pro se. Curtis maintains that "it was unduly presumptuous of the trial court to presume that his desire to 'fire' his trial attorney was an implicit request for appointment of new counsel." Curtis contends that the trial court's failure to question him about his right to proceed pro se violated his right to self-representation.

A criminal defendant's right to self-representation is guaranteed by the Sixth Amendment of the United States Constitution, by art 1, § 13, of the Michigan Constitution, and by MCL 763.1. *People v Williams*, 470 Mich 634, 641-642; 683 NW2d 597 (2004). "*Upon a defendant's initial request to proceed pro se*, a court must determine that (1) the defendant's request is unequivocal, (2) the defendant is asserting his right knowingly, intelligently, and voluntarily through a colloquy advising the defendant of the dangers and disadvantages of self-representation, and (3) the defendant's self-representation will not disrupt, unduly inconvenience, and burden the court and the administration of the court's business." *People v Russell*, 471 Mich 182, 190; 684 NW2d 745 (2004) (emphasis added).

The record very clearly demonstrates that Curtis sought substitute appointed counsel, not self-representation. There is no external indication whatsoever that Curtis wished to represent himself. The issue regarding Curtis' request to terminate his attorney was discussed on the record multiple times, and the court noted that the issue had also been extensively discussed off the record. It is noteworthy that the parties continuously framed Curtis's request as one for substitute appointed counsel and that Curtis never corrected them. Curtis himself spoke on the topic multiple times and never informed the trial court that his request was being misunderstood or misconstrued by the court. In fact, at a pretrial hearing, the trial court asked Curtis to explain what he meant when he said, "I want to fire my lawyer." And Curtis simply spoke about an alleged problem with counsel's handling of a lineup. At trial, Curtis stated, "I just would like a new attorney so we could have a fair trial." As Curtis never indicated or suggested that he wished to represent himself and affirmatively stated just the contrary, the trial court did not deny defendant his right to self-representation. The court was not obligated to explore sua sponte whether Curtis wanted to represent himself when he did not even hint at that possibility. We conclude that reversal is unwarranted.

Curtis next argues that trial counsel was ineffective for pursuing a defense-of-others theory where Curtis had advised his attorney that he was not present at the time of the shooting and where

Curtis did not match the description given by Brehmer. Curtis contends that trial counsel failed to investigate a defense that Curtis was not at the scene of the crime.[1]

The decision whether to pursue a particular defense theory is generally a matter of trial strategy, and we will not substitute our judgment for the judgment of counsel. *People v Newton (After Remand)*, 179 Mich App 484, 492; 446 NW2d 487 (1989). We cannot, however, insulate the review of counsel's performance by simply calling it trial strategy. *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). Initially, this Court must determine whether strategic choices were made after less than complete investigation, with any choice being reasonable only to the extent that reasonable professional judgment supported the limitations on investigation. *Id.*; see also *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015). In *People v Pickens*, 446 Mich 298, 324-325; 521 NW2d 797 (1994), our Supreme Court explained:

> Every criminal defense attorney must make strategic and tactical decisions that affect the defense undertaken at trial. Most criminal defense attorneys have a variety of options from which to choose that affect, if not determine, how the jury understands and comprehends the case. Many of these options in a particular case may be contradictory, confusing, incredible, or simply poor. The role of defense counsel is to choose the best defense for the defendant under the circumstances. [Precedent] permits the defense attorney to do so because, unless the attorney abandons a defense that had a reasonable probability of affecting the jury verdict, the attorney may choose the best defense. Defense counsel must be afforded broad discretion in the handling of cases, which often results in taking the calculated risks

---

[1] Whether counsel was ineffective presents a mixed question of fact and constitutional law, and factual findings are reviewed for clear error, whereas questions of law are reviewed de novo. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). In *People v Carbin,* 463 Mich 590, 599-600; 623 NW2d 884 (2001), the Michigan Supreme Court recited the principles that govern a claim of ineffective assistance of counsel:

> To justify reversal under either the federal or state constitutions, a convicted defendant must satisfy [a] two-part test . . . . First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not performing as the counsel guaranteed by the Sixth Amendment. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. Second, the defendant must show that the deficient performance prejudiced the defense. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim. [Quotation marks and citations omitted.]

which still do sometimes, at least, pluck legal victory out of legal defeat. [Quotation marks and citation omitted.]

We conclude that Curtis has failed to demonstrate that trial counsel's performance did not constitute sound trial strategy. In an unsworn statement attached to Curtis's brief on appeal, which is not part of the record, appellate counsel indicates that he spoke with Curtis and trial counsel, that both men stated that Curtis had informed trial counsel that he was not present, that trial counsel found the denial unbelievable, that trial counsel claimed that Curtis later admitted being present, and that Curtis denied making that admission. Brehmer had initially described the shooter to police as having a "short tapered afro." In initial photo lineups in August 2017 that included a photo of a known associate of codefendant Skinner, but who was not Curtis, Stone and Brehmer could not identify the shooter. It appears that Curtis's photo was not included in those photo arrays. A few days later, Brehmer contacted law enforcement with an identification of Curtis as the shooter after seeing his Facebook page. In subsequent photo lineups, Stone identified Curtis as the shooter with 80% certainty and Brehmer identified Curtis as the shooter with 100% certainty. Stone noted to police "that he recognized [Curtis] by his face, adding that his hair didn't look like that because he was wearing a hoodie or something on his head." At trial, both Stone and Brehmer identified Curtis as being present in the car and shooting Shevrovich in the head.

Under these circumstances, we cannot conclude that trial counsel's performance fell below an objective standard of reasonableness. *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000). Viewed objectively, the theory that Curtis was defending Skinner from a knife assault by Shevrovich is certainly more compelling than the defense that Curtis was not present at the crime scene. We note that Curtis does not allege or identify any particular alibi. Faced with two eyewitnesses who were sitting in the same car with Curtis and identified him as the shooter, we cannot criticize trial counsel for opting in favor of a defense-of-others strategy. The apparent erroneous description by Brehmer of Curtis's hairstyle could have been easily explained by the prosecution given the hoodie, and Brehmer was quite certain that Curtis was the shooter. The fact that the chosen defense was ultimately unsuccessful does not equate to ineffective assistance of counsel. See *People v Stewart*, 219 Mich App 38, 42; 555 NW2d 715 (1996).

In sum, we affirm Curtis's convictions and sentences.

III. DOCKET NO. 351771

Skinner first argues on appeal that the prosecution failed to submit sufficient evidence in support of both the murder and robbery charges. In *People v Kenny*, 332 Mich App 394, 402-403; 956 NW2d 562 (2020), this Court discussed the principles governing a sufficiency argument, observing as follows:

This Court reviews de novo whether there was sufficient evidence to support a conviction. In reviewing the sufficiency of the evidence, this Court must view the evidence—whether direct or circumstantial—in a light most favorable to the prosecutor and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. A jury, and not an appellate court, observes the witnesses and listens to their testimony; therefore, an appellate court must not interfere with the jury's role in assessing the

-5-

weight of the evidence and the credibility of the witnesses. Circumstantial evidence and any reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of a crime. The prosecution need not negate every reasonable theory of innocence; it need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant. All conflicts in the evidence must be resolved in favor of the prosecution. [Quotation marks and citations omitted.]

Skinner initially contends that when viewing the evidence in a light most favorable to the prosecution, the only crime that was established was possession of marijuana as it did not demonstrate that he committed or attempted to commit a larceny or robbery. Skinner maintains that the discussion regarding weighing the baggie of marijuana, along with Skinner's suggestion about where they could go to obtain a scale to weigh the marijuana, did not reflect the behavior of a thief or robber. With respect to Skinner's comments that the marijuana belonged to him and that he was taking it, he argues that the language established "nothing more than the buyer's desire to hold the product until the terms of the deal can be verified."

One of the elements of armed robbery requires that a defendant act in the course of committing a larceny. MCL 750.529; MCL 750.530; *People v Chambers*, 277 Mich App 1, 7; 742 NW2d 610 (2007). The phrase "in the course of committing a larceny" encompasses "acts that occur in an attempt to commit the larceny, or during commission of the larceny, or in flight or attempted flight after the commission of the larceny, or in an attempt to retain possession of the property." MCL 750.530(2). A "larceny" entails the taking and movement of someone else's property with the intent to permanently take the property away from that person. M Crim JI 18.1(3); *People v Crawford*, 325 Mich App 14, 21-22; 923 NW2d 296 (2018), vacated in part on other grounds in 503 Mich 990 (2019). Skinner's argument appears to assail the intent element of larceny and armed robbery. A defendant's intent may be inferred from all of the facts and circumstances, including the particular acts that the defendant engaged in. *People v Cameron*, 291 Mich App 599, 615; 806 NW2d 371 (2011). "Because of the inherent difficulty of proving a defendant's state of mind, only minimal circumstantial evidence from which intent may be inferred need be presented." *Id.*

As discussed earlier, although he had not yet paid for the marijuana, Skinner placed the baggie of marijuana in the pocket of his hoodie. He then stated that it belonged to him and that he was taking it. Shevrovich was plainly convinced that Skinner was committing and intended to commit a larceny, asking Skinner, with knife drawn, whether he was robbing Shevrovich of the marijuana. Skinner did not deescalate the situation, did not return the marijuana, and did not deny that he was stealing the marijuana. Instead, Skinner, exhibiting defiant behavior, kept the marijuana and asked Shevrovich whether he planned on stabbing Skinner. Curtis then proceeded to shoot Shevrovich. A juror could reasonably infer from this evidence that Skinner took the baggie of marijuana with the intent to permanently deprive Shevrovich of the marijuana. Accordingly, there was sufficient evidence to support the conviction for armed robbery.

Skinner next argues that the evidence was insufficient to establish the requisite malice for aiding and abetting first-degree felony murder. Under the felony-murder statute, MCL 750.316(1)(b), malice must be proven, meaning that it must be shown that a defendant acted with an intent to kill, with an intent to inflict great bodily harm, or with a wanton and willful disregard

-6-

of the likelihood that the natural tendency of his or her behavior is to cause death or great bodily harm. *People v Reichard*, 505 Mich 81, 87; 949 NW2d 64 (2020). "MCL 750.316(1)(b) operates . . . to elevate a second-degree murder to first-degree murder if it was committed in the commission of one of the enumerated felonies." *Id.* Robbery and larceny are two of the enumerated felonies. MCL 750.316(1)(b).

With respect to aiding and abetting, MCL 767.39 provides that "[e]very person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense." With regard to the elements generally necessary to prove to convict a defendant under an aiding and abetting theory, it must be shown (1) that the charged crime was committed by the defendant or some other person (principal), (2) that the defendant performed acts or gave encouragement that assisted in the commission of the crime, and (3) that the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that aid and encouragement were provided. *People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006). With respect to the last or third element, the *Robinson* Court, which addressed a conviction for second-degree murder under an aiding and abetting theory, elaborated:

> We hold that a defendant must possess the criminal intent to aid, abet, procure, or counsel the commission of an offense. A defendant is criminally liable for the offenses the defendant specifically intends to aid or abet, or has knowledge of, as well as those crimes that are the natural and probable consequences of the offense he intends to aid or abet. Therefore, the prosecutor must prove beyond a reasonable doubt that the defendant aided or abetted the commission of an offense and that the defendant intended to aid the charged offense, knew the principal intended to commit the charged offense, or, alternatively, that the charged offense was a natural and probable consequence of the commission of the intended offense. [*Id.* at 15.]

Under the natural and probable consequences theory, criminal liability arises when a defendant participates in a common enterprise and one would expect the consequence at issue to happen in light of the nature of the enterprise. *Id.* at 10. Examining the particular facts involved in *Robinson*, the Court concluded that "[t]he victim's death [was] clearly within the common enterprise the defendant aided because a homicide might be expected to happen if the occasion should arise within the common enterprise of committing an aggravated assault." *Id.* at 11 (quotation marks omitted). The law "makes clear that one who aids and abets a felony murder must have the requisite malice to be convicted of felony murder, but need not have the same malice as the principal." *Id.* at 14.

Skinner argues in his brief on appeal:

> Even if we accept the prosecution's theory that Mr. Skinner committed larceny by taking the baggie of marijuana . . .[,] a death is not a foreseeable or expected result. The facts here do not suggest that death or great bodily harm is the *probable* result of a larceny of $125 worth of marijuana. The evidence shows nothing more than Mr. Skinner pocketing a baggie of marijuana. This is not an

action that leads to murder or death, or tha[t] can reasonably be expected to lead to death or great bodily harm. Mr. Curtis' murder of Mr. Shevrovich is horrifying and shocking, but no evidence demonstrated malice in the heart of Mr. Skinner.

Skinner's argument fails to view the evidence in a light most favorable to the prosecution and fails to recognize that only minimal circumstantial evidence is needed to infer intent. As the prosecution emphasized during closing arguments, Skinner indicated that he was taking the marijuana and was completely unfazed when Shevrovich brandished the knife. These facts gave rise to a reasonable inference that Skinner was fully aware that Curtis had a firearm, such that the knife was no real threat to Skinner. The prosecutor remarked, "Why is [Skinner] so cocky? I'll tell you why he's so cocky. He's so cocky cause he knows Curtis has a gun. He has no reason to fear that knife. He knows [that Curtis] has his back." Taking into consideration that reasonable inference, Skinner escalated the tension and the danger by continuing to confront the knife-wielding Shevrovich over the marijuana. By doing so, Skinner increased the likelihood that Curtis would have to use his gun against Shevrovich. Even assuming that the situation started out as a simple marijuana transaction posing little danger, we must acknowledge the possibility of a shooting increased dramatically once events began unfolding and given Skinner's continued prodding of Shevrovich. Furthermore, inferring from the evidence that Skinner knew that Curtis had a gun and that defendants planned to steal the marijuana, the danger even existed from the very beginning of the meeting. Shevrovich's death by gunfire was within the common enterprise of the armed robbery that Skinner engaged in and aided and abetted, and a homicide might be expected to happen within the common enterprise of an armed robbery involving a gun. In light of the direct and circumstantial evidence, along with the reasonable inferences arising from the evidence, a jury could reasonably have concluded that malice was established on the basis that Skinner acted with a wanton and willful disregard of the likelihood that the natural tendency of his behavior was to cause death or great bodily harm. Additionally, a jury could have also reasonably concluded that a killing was the natural and probable consequence of Skinner's actions in taking the marijuana and escalating the tension and danger by essentially daring Shevrovich to retrieve the marijuana with use of the knife, knowing that Curtis had a gun available to shoot Shevrovich. In sum, we hold that there was sufficient evidence to support the conviction of first-degree felony murder.

Skinner next argues that the trial court failed to give jury instructions that adequately and fairly presented the elements of the charged crimes. Skinner maintains that the instructions were long and confusing and that the court failed to clearly delineate between instructions pertaining to Skinner and those pertaining to Curtis. Skinner's trial counsel expressly stated that he had no objections to the jury instructions. And "[a]n affirmative statement that there are no objections to jury instructions constitutes express approval of those instructions, thereby waiving appellate review of any claimed error." *Kenny*, 332 Mich App at 399, citing *People v Kowalski*, 489 Mich 488, 505 n 28; 803 NW2d 200 (2011), and *People v Hershey*, 303 Mich App 330, 351; 844 NW2d 127 (2013).

Skinner next argues that there were multiple instances of ineffective assistance of counsel. He first contends that counsel improperly conceded or relented on the key element of larceny, which was an element of the armed-robbery and felony-murder charges. At one point during his closing argument, trial counsel stated that "there's no solid proof that [Skinner] ever intended to do anything except maybe steal a $125 worth of marijuana." Counsel, however, immediately

stated that "that probably was not the case" and generally argued that there was no larceny. Trial counsel focused on Skinner's alleged lack of knowledge that Curtis was carrying a gun, which went to the charges of armed robbery and felony murder, particularly to the malice element of the latter. Counsel may have believed that an *equivocal* concession on larceny may have given him more credibility in the eyes of the jurors with respect to his arguments regarding the gun and malice. We cannot conclude that the challenged part of counsel's closing argument constituted deficient performance. See *People v Carbin,* 463 Mich 590, 600; 623 NW2d 884 (2001). Moreover, assuming deficient performance, we find that Skinner has not demonstrated the requisite prejudice considering the equivocal nature of the concession, the remainder of counsel's closing argument challenging larceny, and the strong evidence, enumerated earlier, showing that Skinner intended to rob Shevrovich of the marijuana. See *id.*

Skinner next argues that trial counsel was ineffective for failing to file a written motion for separate trials or juries and failing to even make an oral record of the basis for the request for a separate trial or two juries. At a pretrial hearing, the prosecutor orally requested consolidation of the two criminal cases. In response, Skinner's attorney asked for a separate trial or a separate jury because Skinner's interest was "completely antithetical to Mr. Curtis' interest." The trial court denied Skinner's request, reasoning as follows:

> Well, this is not in the form of a motion, written motion. I've heard nothing that would suggest that they have confessions or statements which implicate each other. They may have totally opposite positions in this case, but that doesn't mean that they can't be tried consolidated, so I'm—your request for separate trials is denied. They will be tried together, as I did grant the adjournment of the co-defendant to August 5 for reasons I believe to be compelling, and in the interest of the consolidation and the efficiency to do that.

MCL 768.5 provides that "[w]hen 2 or more defendants shall be jointly indicted for any criminal offense, they shall be tried separately or jointly, in the discretion of the court." "On a defendant's motion, the court must sever the trial of defendants on related offenses on a showing that severance is necessary to avoid prejudice to substantial rights of the defendant." MCR 6.121(C). As construed by our Supreme Court, MCR 6.121(C) mandates severance "only when a defendant provides the court with a supporting affidavit, or makes an offer of proof, that clearly, affirmatively, and fully demonstrates that his substantial rights will be prejudiced and that severance is the necessary means of rectifying the potential prejudice." *People v Hana*, 447 Mich 325, 346; 524 NW2d 682 (1994). "The failure to make this showing in the trial court, absent any significant indication on appeal that the requisite prejudice in fact occurred at trial, will preclude reversal of a joinder decision." *Id*. at 346-347. That defenses are inconsistent is not enough to mandate severance; instead, the defenses must be mutually exclusive or irreconcilable. *Id*. at 349. "The tension between defenses must be so great that a jury would have to believe one defendant at the expense of the other." *Id*. (quotation marks and citation omitted).

Trial counsel never properly presented the request for severance under MCR 6.121(C), as construed by *Hana*. Regardless, Skinner fails to present a sound argument that severance was necessary to avoid prejudice to his substantial rights. Skinner argues that he was entitled to a separate trial or jury because his defense entailed the specific denial that he committed a larceny, whereas Curtis's defense was that he acted in defense of Skinner. Further, Skinner asserts that it

-9-

was irrelevant to Curtis whether Skinner was stealing the marijuana "so long as Mr. Curtis was ignorant of any such plan." Curtis had argued that he knew nothing about whether a robbery was being committed; therefore, according to Skinner, "when Shevrovich produced the knife, Curtis shot Shevrovich to defend his friend and not in furtherance of a larceny or robbery."

We fail to understand the logic of this argument in terms of its necessitating severance. And it certainly does not demonstrate that the defenses were mutually exclusive or irreconcilable or that the tension between the defenses was so great that a jury would have to believe Curtis at the expense of Skinner. Indeed, Curtis's defense that he acted in defense of Skinner is entirely compatible with Skinner's defenses that he did not commit or attempt to commit a larceny, that he did not know that Curtis had a gun, and that he did not act with malice. Accordingly, trial counsel was not ineffective for failing to file a futile written motion for severance, *People v Savage*, 327 Mich App 604, 617; 935 NW2d 69 (2019), nor has Skinner demonstrated the required prejudice, *Carbin,* 463 Mich at 600.

Skinner next argues that trial counsel was ineffective for failing to seek fair and adequate jury instructions. The contention harkens back to Skinner's earlier waived argument that the instructions were long and confusing and that the court failed to clearly delineate between instructions pertaining to Skinner and those pertaining to Curtis. Skinner's complaint relates to the felony-murder and armed-robbery instructions. These instructions, however, began with the model instructions and appeared to add defense-friendly language. Moreover, the trial court did instruct the jury to consider each defendant separately, including with respect to malice. Before launching into the felony-murder instructions, the trial court stated that "[b]oth defendants are charged with first-degree felony murder." Thus, it was clear that the felony-murder instructions applied to both Curtis and Skinner. The felony-murder instructions led directly into the armed-robbery instructions, and it was quite evident that the armed-robbery instructions also concerned both defendants. When reviewed in their entirety, even if somewhat imperfect, the trial court's final instructions fairly represented the issues and sufficiently protected Skinner's rights. See *People v Clark*, 274 Mich App 248, 255-256; 732 NW2d 605 (2007). Accordingly, trial counsel's failure to object to the instructions did not constitute deficient performance. See *Carbin*, 463 Mich at 600.

In a Standard 4 brief, Skinner argues that trial counsel should have objected to the defense-of-others instruction because it was not supported by the evidence. The evidence revealed that Shevrovich brandished a knife in the confined space of an automobile and acted in a threatening manner toward Skinner. To the extent that Skinner is now arguing that the trial court erred by giving the instruction on defense-of-others, we reject the argument because the evidence supported the instruction. *People v Spaulding*, 332 Mich App 638; 957 NW2d 843 (2020) (jury instructions must include defenses and theories if supported by the evidence). Consequently, trial counsel was not ineffective for failing to raise a futile objection to the instruction. *Savage*, 327 Mich App at 617. We also note that the trial court made clear that the defense-of-others instruction solely concerned Curtis. Moreover, we cannot conceive of any prejudice Skinner suffered from the court's giving the defense-of-others instruction. *Carbin*, 463 Mich at 600.

Finally, Skinner argues that trial counsel was ineffective for failing to object to Stone's testimony that he had heard bad things about Skinner and by actually eliciting testimony from Stone regarding Skinner's bad reputation. Skinner contends that Stone's testimony constituted

inadmissible hearsay and impermissible character evidence pursuant to MRE 404(a). Skinner points to only two particular snippets of challenged testimony. On the prosecutor's direct examination of Stone, Stone testified that he had "heard a lot of bad things about [Skinner]." And on cross-examination by Skinner's trial counsel, Stone testified, "I was nervous about [the marijuana transaction] cause I heard about him [Skinner]." This is the only testimony cited by Skinner in support of his argument; therefore, it is the only testimony that we will consider.

The full extent of Skinner's hearsay argument is that the "testimony is hearsay and inadmissible pursuant to MRE 801 and 802." We deem this woefully undeveloped and inadequately briefed issue abandoned. See *In re TK*, 306 Mich App 698, 712; 859 NW2d 208 (2014) (a party cannot simply assert an error or announce a position and then leave it to this Court to discover and rationalize the basis for the claims or unravel and elaborate his argument, and then search for authority to sustain the position). Moreover, MRE 803(21) provides an exception to hearsay for testimony regarding the "[r]eputation of a person's character among associates or in the community."

Generally, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion[.]" MRE 404(a). When the trial excerpts cited by Skinner are considered in conjunction with other parts of Stone's testimony, it becomes evident that the challenged testimony was not elicited for the purpose of proving that Skinner acted in conformity with his purported reputation in relation to the commission of the charged crimes. Rather, the testimony was part of a larger discussion regarding the preparation and planning of the marijuana transaction, giving context to the transaction, and Stone also testified that Skinner had concerns and was worried about Shevrovich's reputation. We cannot conclude that trial counsel's performance was deficient or that Skinner demonstrated the requisite prejudice. *Carbin*, 463 Mich at 600. In sum, we affirm Skinner's convictions and sentences.

We affirm.


/s/ Mark T. Boonstra
/s/ Jane E. Markey
/s/ Deborah A. Servitto